UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| M.W., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10CV914 CDP |
| | ) | |
| CITY OF WENTZVILLE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

In January of 2009, plaintiff discovered the body of her sister hanging from a cord in the sister's basement, over a pool of blood. Defendant Calvin Nevels, a police officer, had been to the home when the sister was reported missing earlier that evening, but did not search the basement, because the decedent's husband, defendant Kelly Blanchard, assured Nevels that his wife was not in the home. Plaintiff was severely traumatized by this incident, and is still undergoing medical treatment as a result.

Plaintiff brings this case under 42 U.S.C. § 1983 against the City of Wentzville, Missouri and police officer Nevels, claiming that they violated her substantive due process rights and her liberty interest in personal security by failing to prevent her discovery of the body. She brings a state-law claim of negligent infliction of emotional distress against Blanchard.

Blanchard has moved to dismiss, and Nevels and the City seek summary judgment.  I conclude that the prevailing law of this circuit does not allow plaintiff to recover from either the City or Officer Nevels in this tragic case, and so I will grant summary judgment to them.  Because the claim against defendant Blanchard raises a novel and close question of state law, I decline to exercise supplemental judgment over it, and I will dismiss it without prejudice, so it can be refiled in state court.

## **Background**[1]

Defendant Kelly Blanchard called the Wentzville police department at approximately 6:30 p.m. on January 15, 2009 to report his wife missing.  A dispatcher sent officer Calvin Nevels to the Blanchard home.  It was dark outside when Nevels arrived.  Nevels testified that he saw writing on the mailbox that said "don't come in." Handwritten messages on the outside of the Blanchard home read: "don't come in," "well you are a single parent now, what do you think about that," "just a moment's courage right Kelly," "you go elsewhere so u + [our child] don't see anything, then call a friend or police," "take [our child] elsewhere," "you should be happy," "leave - call police," "don't go in the basement," and "I feel so stupid what kind of disease do I have."   Nevels testified that he could not

_____

[1] Only the facts that Nevels knew at the time of the alleged violation, his communication with the plaintiff, and the plaintiff's actions after her communication with Nevels are relevant for purposes of the motion for summary judgment.

remember exactly what that writing said.  Nevels went directly into living room, and only Blanchard and his son were present.  Nevels testified that Blanchard seemed detached in that he was not particularly excited even though his wife was missing, but he was coherent and did not seem evasive in answering questions.

Blanchard told Nevels that his wife was acting crazy, the two had a fight resulting in him asking for a divorce, and she and her car were missing.  He also told Nevels that his wife had attempted suicide seven years earlier, she was currently under a doctor's care, and he believed she was going to hurt herself.  At some point during the initial conversation Blanchard and Nevels moved into the kitchen.  Nevels noticed a broken computer, and Blanchard pointed out some handwritten notes.  Nevels read a couple of the notes, but testified that he did not remember what the notes said.  After being shown the notes at his deposition, Nevels was able to recognize a couple of them.

Nevels testified that he asked Blanchard about the writings.  Blanchard stated the that he did not know what the writing on the mailbox or the front door meant, but his wife was acting crazy and she was going to hurt herself.  When Nevels asked Blanchard whether the writings belonged to his wife, Blanchard responded that his wife was acting crazy.  When Nevels asked Blanchard why he thought his wife might hurt herself, Blanchard again responded that she was acting crazy.  Nevels testified that despite varying questioning Blanchard kept

emphasizing those points.  Nevels also asked Blanchard how his wife previously attempted suicide.  Blanchard said she had taken pills or something similar.

Blanchard told Nevels that he did not know the name of his wife's doctor, but she may have gone to a friend's house.  Blanchard did not give Nevels the friend's information or information for his wife's family.  He told Nevels he would contact the friend and his wife's sisters himself.  Blanchard also stated that he did not know where his wife's cell phone was, but that she did not have it with her.

Nevels was at the Blanchard home for approximately ten minutes during his first visit.  He went back to the Wentzville police station for approximately ten minutes to get paperwork for a missing person's report and to speak to one of his superiors.  Nevels then returned to the Blanchard home.  On the second visit he got more information from Blanchard, including a description of his wife.  Blanchard pointed out his wife's cell phone on the kitchen floor.  Nevels had not noticed the phone before and concluded that it was placed there between visits.  Nevels tried to turn the phone on, but it did not turn on.  Blanchard told Nevels the phone was broken.  Blanchard also pointed out his wife's winter coat in the living room. Nevels testified that he could not recall whether the coat had been there on his first visit.

During the second visit Nevels asked Blanchard whether he had any weapons in the home.  Blanchard stated that he had guns in a locker in the

basement, but he was the only one with a key.  Blanchard had the key on his person.  When Blanchard went to the basement to check the locker Nevels attempted to follow him, but he asked Nevels to wait at the top of the stairs without explaining why.  Nevels could not see the entire basement from the top of the stairs.  Blanchard eventually told Nevels that a .22 caliber gun was missing from the locker.  Nevels did not ask Blanchard how someone could have removed the gun if Blanchard was the only one with a key.

Nevels testified that after his investigation he concluded that Blanchard was not being completely forthcoming about his missing wife.  He also concluded that Blanchard's wife may have wanted to kill herself because she had suicidal tendencies and possibly possessed a weapon.  Nevels broadcast a description of her over police radio and put out a state-wide All Points Bulletin (APB).

Blanchard's wife was plaintiff's sister.  The plaintiff learned that her sister was missing when she received a hysterical phone call from her mother.  The mother said Blanchard had called and said the sister was missing and acting crazy; she could hear plaintiff's nephew in the background of the call yelling to call the police.  When plaintiff got off the phone with her mother she placed calls to her other sister, to Blanchard, and then to the police department.  A dispatcher connected her to Nevels.

The plaintiff told Nevels she was calling on behalf of the family to confirm that a state-wide APB had gone out.  Nevels told her that he had been to the Blanchard home, her sister was a missing person, and he had put out the APB. Nevels did not tell plaintiff he had not searched the entire home for her sister.  The two discussed what would happen if the police found her sister.  The plaintiff told Nevels that she was not convinced that Blanchard was telling the truth, but did not explain what she meant by that statement.

After speaking to Nevels, plaintiff called her other sister back, and they decided to meet at the Blanchard home and then to look for their missing sister. The plaintiff never told Nevels that she intended to go to the Blanchard home. When the sisters arrived, Blanchard, his son, and one of his friends were coming out of the home.  Everyone went back into the home together.  The plaintiff went into the home the same way Nevels had when he investigated Blanchard's missing person report.  She had the same opportunity to see the writings outside the home. She testified that she did not read all of the writings outside the home, but specifically remembers the one that said "then call coron[e]r or police."  Blanchard also pointed out to her the notes he had earlier shared with Nevels.

The plaintiff testified that even after reading the note that said "don't go down there," and even though she did not trust Blanchard about many things, she believed Blanchard when he said he had been in the basement and her sister was

not there because she believed those statements had been corroborated by Nevels when he said he had been to the home and her sister was missing.  She also testified that Blanchard's friend, who arrived at the Blanchard home before her, told her that her sister was not home.  The plaintiff testified that she went into the basement to look for clues to help find her sister.  When she went into the basement she found her sister's dead body.  Her sister's body had a gun shot wound and was hanging from an electrical wire.

Someone at the home called the police department and reported the discovery of the body.  When officers arrived, they declared the home a crime scene and family members were removed.  The missing car was found four houses down from the Blanchard home.  A homicide investigation was conducted, and the police concluded that plaintiff's sister had committed suicide.

## **Discussion**

Not all tragic events involving the police constitute violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989).  The motion for summary judgment alleges that Nevels is entitled to qualified immunity because the record does not establish that the Blanchard home should have been treated as a crime scene.  I agree.

## I.     Qualified Immunity

Qualified immunity is a question of law, *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005), and thus it is appropriately resolved on summary judgment, *see Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). In determining whether Nevels is entitled to qualified immunity, I must consider two questions: (1) whether the facts as shown, construed in the light most favorable to the plaintiff, establish that Nevels violated plaintiff's constitutional or statutory rights, and (2) whether the rights were clearly established at the time of the incident, such that a reasonable official would have known that his actions were unlawful.  *See Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815-16 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson*, 129 S. Ct. at 818.  For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The plaintiff claims Nevels violated her substantive due process rights and her liberty interest in personal security by failing to secure the Blanchard home as a crime scene despite warnings that indicated a crime had been committed or was occurring.  She argues that the failure to do so constituted state-created danger because it made her more vulnerable to the chance of finding her sister's body.

The Eighth Circuit law on state-created danger under 42 U.S.C. § 1983 is as

follows:

> States have no general affirmative obligation to protect individuals
> against private violence.  The Due Process Clause of the Fourteenth
> Amendment is phrased as a limitation on the State's power to act, not
> as a guarantee of certain minimal levels of safety and security.  Its
> purpose is to protect the people from the State, not to ensure that the
> State protects them from each other.  The State's failure to protect an
> individual against private violence simply does not constitute a
> violation of the Due Process Clause.  However, substantive due
> process requires a state to protect individuals under two theories.
> First, the state owes a duty to protect those in its custody.   Second,
> the state owes a duty to protect individuals if the state created the
> danger to which the individuals are subjected. . . . Under the
> state-created danger theory, the plaintiffs must prove (1) they were
> members of a limited, precisely definable group; (2)  [the police
> officer's] conduct put the plaintiffs at significant risk of serious,
> immediate, and proximate harm; (3) the risk was obvious or known to
> [the officer]; (4)  [the officer] acted recklessly in conscious disregard
> of the risk; and (5) in total,  [the officer's] conduct shocks the
> conscience. Mere negligence is not conscience-shocking and cannot
> support a claim alleging a violation of a plaintiff's substantive due
> process rights.

*Avalos v. City of Glenwood*, 382 F.3d 792, 789-99 (8th Cir. 2004).  The plaintiff

cannot meet this high burden.

Plaintiff does not allege that Nevels knew or should have known her sister's

body was in the basement, and she has shown nothing that could rise to the level of

recklessness.  Instead, the plaintiff's response to this motion argues that the

writings on the front door of the Blanchard home indicated that her sister had

committed suicide and her body was inside the home.  She also claims common

sense required Nevels to search the home.  The City and Nevels argue that the actual meaning of the writings is a matter of opinion.  But this distinction is irrelevant because plaintiff's evidence fails to establish that Nevels actually read the writing on the front door.  Additionally, Nevels had no reason to know that plaintiff would go to the house.

The undisputed facts show it was dark outside when Nevels arrived at the Blanchard home.  Further, Nevels gave no testimony as to whether he read the writing on the front door, let alone what portions he may have read.  Even if Nevels had not read the writing and that conduct amounted to negligence in his investigation, negligence is not enough to shock the judicial conscience for purposes of substantive due process.  And Nevels did not consciously disregard a risk of violating the plaintiff's constitutional rights because it is undisputed that Nevels did not know plaintiff was going to the Blanchard home.

Perhaps Nevels should have investigated more, and perhaps he should have asked Blanchard more questions to follow up on his suspicions that Blanchard was not being completely forthright.  Blanchard asked him not to come to the basement, and whether Nevels should have ignored that request and undertaken a warrantless search of the basement is not at all clear.   Nevels' decisions that evening, although arguably negligent, were not so deliberately indifferent that his conduct shocks the judicial conscience.

The Constitution does not impose an obligation on a state to provide perfect or even competent rescue services.  Even if some other course of action may have been "more effective in protecting" a citizen, the Due Process Clause does not impose liability for negligently inflicted harm.  *Dodd v. Jones*, 623 F.3d 563 (8th Cir. 2010).  In *Dodd*, the plaintiff, an intoxicated driver, caused a single car accident leaving him lying in the road.  A third party noticed the plaintiff and parked his car in the other lane and shined his lights toward the plaintiff's body.  When police officers arrived, they turned on their emergency lights and asked the third party to move his car to provide space for an ambulance.  A few minutes later another drunk driver ran the plaintiff over despite the officers' waiving their arms and flashing warning lights.

The plaintiff in *Dodd* sued the officers under § 1983, alleging that the officers created a more dangerous situation for him.  He argued that the officers' emergency lights may have distracted the drunk driver and the officers should not have instructed the third party to move his car.  He also challenged the officers' failure to use road flares.  The court held that the officers were entitled to qualified immunity because the possibility that the officers' rescue efforts made the plaintiff worse off was too speculative to trigger a constitutional duty of care.  *Id.* at 568. The court further stated that even assuming a constitutional duty arose, the

evidence did not support a finding that the officers' conduct "was so outrageous as to shock the contemporary conscience." *Id.*

Here, as in *Dodd*, the police officer was not required to provide a perfect or even competent service. The constitution does not require an office in Nevels' position to read every writing in the home, inspect every room in the home, and secure the home as a crime scene, even if doing so might have prevented harm to plaintiff. The constitution only requires that an officer in Nevels' position refrain from deliberate indifference to plaintiff's liberty interest in personal security. *Dodd*, 623 F.3d at 567. Nevels, as the officers in *Dodd*, is entitled to qualified immunity because the possibility that his investigation in any way made the plaintiff worse off is too speculative to trigger a constitutional duty, and even assuming such a duty arose his conduct does not shock the judicial conscience.

## II.    Failure to train, monitor, or supervise

As in *Avalos*, the decision that the officer is entitled to qualified immunity resolves the claims against the city. *See Avalos*, 382 F.3d at 802. But even if the claim against Nevels had survived summary judgment, the claim against the city could not.

Municipalities cannot be held liable on a *respondeat superior* theory under § 1983 for the acts of their employees. *Monell v. Dept. of Soc. Serv.*, 436 U.S. 658, 694 (1978). A city can be held liable under § 1983 for failure to train its police

officers, *City of Canton v. Harris*, 489 U.S. 378, 378 (1989), or supervise its officers, *id.* at 398.  To establish failure to train, the plaintiff must prove that:  (1) the city's training procedures were inadequate, (2) it was deliberately indifferent to the rights of its people in adopting the procedures, such that the failure to train reflects the municipality's deliberate or conscious choice, and (3) the alleged deficiency actually caused the harm.  *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996).  To establish a city's liability based on failure to monitor or supervise, the plaintiff must show that city officials had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action.  *Id.* at 1175.

The City has submitted records of Nevels' training and plaintiff has submitted no evidence to demonstrate that the training was inadequate.  The plaintiff submitted evidence detailing Nevels' employment history and past disciplinary record, but none of that evidence shows any incident even remotely similar to this one.  The City is entitled to summary judgment.

### III.    Blanchard's Motion to Dismiss

Plaintiff alleges that Blanchard was negligent in allowing her to find the body of her sister, and that he is liable for her resulting emotional distress. Blanchard argues that he did not owe plaintiff any duty of care and that she does not fall within the "zone of danger" required to allow a bystander to recover emotional distress damages, relying on *Asaro v. Cardinal Glennon Memorial*

*Hospital*, 799 S.W.2d 595 (Mo. banc 1990), and similar cases.  Plaintiff, in turn, argues that she is covered by Missouri's "rescue doctrine" as set out in *Lowrey v. Horvath*, 689 S.W.2d 625 (Mo. banc 1985).

I am inclined to think that neither of these lines of cases applies, but instead that this is simply a premises liability case.  The cases relied on by both parties are cases where the defendant caused an accident and then a bystander or rescuer was damaged.  But Blanchard cannot be liable for causing the suicide, so those cases are not at all analogous.  I am not aware of any Missouri premises liability case involving only emotional distress damages.  The issue of when emotional distress damages can be awarded is an issue the Missouri courts have struggled with over the years, and I believe the issue as presented in this case is better dealt with by Missouri courts.

My jurisdiction over this claim is one of supplemental jurisdiction under 28 U.S.C. § 1367.  As I am granting summary judgment on the only federal claim, I have the discretion to dismiss this supplemental state-law claim without prejudice. *See* 28 U.S.C. § 1367(c); *Miner v. Local 373*, 513 F.3d 854, 866 (8th Cir. 2008). The supplemental jurisdiction statute provides a tolling mechanism that would allow plaintiff to promptly refile the case in state court, § 1367(d).  It is appropriate to allow Missouri courts to decide the issue in this unusual case, where there are no longer any pending federal claims.

Accordingly,

**IT IS HEREBY ORDERED** that defendant Nevels and defendant City of Wentzville's motion for summary judgment [#47] is granted.

**IT IS FURTHER ORDERED** that defendant Blanchard's motion to dismiss [#33] is denied, but the claim against that defendant will be dismissed without prejudice under 28 U.S.C. § 1367.

A separate judgment in accord with this order is entered this same date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 9th day of September, 2011.


- 15 -